In re **HEALTHCARE AMERICA MEDICAL GROUP, INC.,**
Debtor.

**Picker Financial Group, L.L.C., Plaintiff,**

v.

**Healthcare America Medical Group, Inc., and Horizon Bank,**
Defendants.

**Bankruptcy No. 01–04823–8P1.
Adversary No. 02–102.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Nov. 5, 2002.

Robin F. Frydman, Esquire, Fort Lauderdale, FL, Dawn Carapella, Esquire, Tampa, FL, for plaintiff.

David W. Steen, Esquire, Tampa, FL, Lynn V. Cravey, Esquire, St. Petersburg, FL, for defendants.

### ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Doc. Nos. 21 & 26)

ALEXANDER L. PASKAY, Chief Judge.

This is a confirmed Chapter 11 case and the matter under consideration is a dispute between Horizon Bank (Horizon) and Picker Financial Group, L.L.C. (Picker) concerning the right of Horizon to trump the security interest of Picker, based on the doctrine of equitable subrogation, encumbering the assets of the debtor, Healthcare America Medical Group, Inc. (Debtor). The assets at issue are primarily the accounts receivable of the Debtor. Both Horizon and Picker agree that the relevant facts are without dispute and do not raise any genuine issues of material facts. It is there where the agreement ends and the parties' disagreement as to the inferences to be drawn from the facts creates the controversy under consideration. They also disagree with the proper legal principles based on the facts, which according to Picker and Horizon support their respective positions. The relevant facts are indeed without dispute and appear from the record as follows:

### American Loan

At the time relevant, the Debtor, previously known as Bay Area Medical Group, Inc., was the owner and operator of a large medical facility in Bradenton, Florida. The majority of the physicians working at the facility were the stockholders of the Debtor. The facility was managed by one of its physicians. In December of 1996, the Debtor obtained a loan in the amount of $300,000 from American Bank of Bradenton (American), which loan was secured by a blanket security interest encumbering all assets of the Debtor. On December 4, 1996, American filed for record a UCC–1 form, perfecting its security interest in the assets of the Debtor. It is without dispute that American held a first position on the assets of the Debtor. (Exh. A to Aff. of C. Walker).

At the relevant time, Charles Conoley (Conoley) was the Vice President at Amer-

ican in charge of commercial loans. In November of 1996, the Debtor approached Conoley and discussed the possibility of obtaining financing for the medical facility that the Debtor operated. Dr. Mucasey, speaking on behalf of the group, told Conoley that the group would be in need of financing and also that the individual doctors that were part of the group would possibly need a loan in excess of 1.5 million dollars. Conoley, as loan officer of American, approved the request, submitted the same to the loan committee, and the loan was granted. The initial loan was made to the individual doctors, which was guaranteed by the Debtor and collateralized by the assets of the Debtor. All of these loans were a series of loans, represented by possibly more than 20 promissory notes. It is without dispute that American obtained a security interest on all assets of the Debtor and filed of record UCC–1 form. This fixed a first position lien for American on all of the assets of the Debtor, securing not only the obligation owed by the Debtor, but also the outstanding balance owed by the individual physicians. Thereafter, the loan involving the Debtor was ultimately paid down through the years, and at the time of the Horizon loan was made, it was in the amount of $259,118.57. (¶ 8 of Aff. of C. Conoley).

### Picker Loan

In February of 1999, the Debtor and Picker entered into an Equipment Lease. The Equipment Lease covered major medical equipment used by the Debtor in its facility. Independent of the Equipment Lease, Picker also lent $500,000 to the Debtor in order to finance major alterations of the Debtor's facility in order to accommodate the housing of the equipment leased to the Debtor by Picker. (Exh. B to Compliant). In connection with this loan, the Debtor granted a blanket security interest in all assets of the Debt-

or. (Exh. C to Complaint). It is without dispute that on February 15, 1999, Picker filed the appropriate UCC–1 form and perfected its security interest. (Exh. D to Complaint). Additionally, it is without dispute and it is conceded by Picker that its security interest was junior to the security interest of American.

### Horizon Loan

In June 1998, Conoley left American and started to organize a new bank, which is now known as Horizon Bank. Conoley, acting as the President and CEO of Horizon approached Dr. Mucasey, although it is not clear from the record who initiated the meeting to discuss the possibility of establishing a borrowing relationship with this new bank, Horizon.

On December 8, 1999, the Debtor submitted to Horizon a Credit Request Form requesting a loan in the amount of $800,000. (Exh. A to Aff. of C. Conoley). The form and the accompanying memorandum addressed to the loan committee were signed by Conoley, who recommended an approval of the request. (Exh. B to Aff. of C. Conoley). In due course, the director's loan committee considered the request. On January 24, 2000, the Debtor was informed that its request for a revolving line of credit up to $800,000 was approved. (Exh. E to Aff. of C. Conoley).

On February 23, 2000, the Revolving Credit Loan Agreement (Agreement) was signed, which agreement set forth in detail all the conditions for the loan. (Exh. F to Aff. of C. Conoley). The Agreement specifically provided, in paragraph 5, that the loans or advances made by the bank pursuant to the line of credit shall be used by the Debtor to finance the start-up costs associated with new doctors joining the Debtor's business and *"to pay off the Borrower's [Debtor's] existing credit line with*

*American Bank."* (Emphasis supplied). Paragraph 7 of the Agreement provided that the loan shall be secured by the Debtor's accounts receivables, inventory, furniture and fixtures, equipment, and supplies. In essence, it granted a blanket security interest in all the assets of the Debtor. The Agreement required the Debtor to deliver to Horizon a UCC–1 financial statement. Finally, in paragraph 9 of the Agreement, the Debtor covenanted and agreed that all other indebtedness of the Debtor to American would be paid in full and that the Debtor shall comply with specific duties set forth in this paragraph of the Agreement.

In due course, the Debtor executed the Security Agreement granting a security interest to Horizon on all the property set forth specifically in Schedule A. (Exh. G to Aff. of C. Conoley). The Security Agreement, in paragraph 8, provided that the Debtor shall at all times keep the collateral free from any adverse lien, security interest or encumbrance. The transaction was closed on February 23, 2000 and provided *inter alia* that out of the proceeds of the loan the outstanding balance owed to the American in the amount of $259,118.75 was to be paid.

As part of this transaction, American agreed to release its security interest on its collateral, to wit: its lien on all assets of the Debtor, which secured the indebtedness owed by the Debtor and also by the stockholders of the Debtor. The balance owed by the Debtor to American was paid in full and American placed on public record on March 16, 2000, a UCC–3 Form, releasing its lien on the Debtor's assets (Exh. B to Aff. of C. Walker), or after the Debtor placed on record the UCC–1 financing statement encumbering all the assets of the Debtor in favor of Horizon. It is evident that on the date that Horizon placed for record its UCC–1 form, it was junior to the position of the still outstanding security interest of American, which was not cancelled until March 16, or about fifteen days after Horizon perfected its interest.

It appears that prior to closing the Horizon, Horizon's attorney conducted a UCC records search which revealed that Picker already had a UCC–1 on record encumbering all assets of the Debtor, which was in second position and junior to the interests of American. Although the record reflects that the attorney for Horizon furnished the information he obtained from his UCC search, to Conoley on the day of the closing, according to Conoley, he did not read the information furnished to him. Thus, Horizon did not know of the existence of Picker's interest at the time it closed its loan, although it clearly should have known.

On March 21, 2001, the Debtor filed its Petition for Relief under Chapter 11. On April 3, 2001, the Debtor filed an Emergency Motion and sought authorization to use the cash collateral of Horizon. It is without dispute that the Motion was set down for hearing with notice to all parties, including Picker, and Picker did not object or participate in the hearing. This Court entered an Order on April 18, 2001, and authorized the Debtor to use Horizon's cash collateral. It is without dispute that it was not until sometime after that that Picker sought a reconsideration of the cash collateral order. This was the first time Picker asserted, in this Court, that it had a position superior to the interest of Horizon in the Debtor's assets, including the cash collateral. At the conclusion of this hearing, the original cash collateral Order was vacated and Picker's Motion was granted, which also granted adequate protection to Picker but expressly provided that the Order shall not be construed to be an adjudication of the respective positions to the

cash collateral which was authorized to be used.

On February 15, 2002, Picker filed its Complaint to determine the validity, priority or extent of a lien and other interests in property. After some preliminary proceedings, on June 19, 2002, this Court held a pretrial conference and entered an Order setting the final evidentiary hearing for September 10, 2002, and established a detailed discovery schedule. The hearing was continued due to failure of the parties to complete discovery. On October 11, 2002, Horizon filed its Motion for Summary Judgment, which was followed by the same Motion filed by Picker on the same date. These are the two Motions, which are currently under consideration by this Court.

In support of its Motion for Summary Judgment, Picker asserts that based on the undisputed facts, it is entitled to a judgment in its favor as a matter of law. When the American lien was released, Picker moved into the position formerly held by American and became the first lienholder on all the assets of the Debtor.

In support of its Motion for Summary Judgment, Horizon contends that it is entitled, based on the doctrine of equitable subrogation, to occupy the position formerly held by American. Therefore, its lien interests in the assets of the Debtor are superior to the interests of Picker, albeit only to the extent of the payoff amount, which is $259,118.75. Horizon contends that it was clearly the intention of the parties that proceeds of the loan granted by Horizon be used to retire the American loan and pay off the remaining balance in full. Lastly, Horizon contends that there is no injustice to Picker if this Court subrogates Horizon to American's position because Picker was always in a second position to American. And, not only was Picker always in a second posi-

tion to American, but it was previously in second to the tune of one million dollars, which has been reduced to only $259,118.75.

In opposition to Horizon's position, Picker contends that the defense of equitable subordination is without merit and not supported by law because: (1) at the time Horizon acquired its security interest in the assets of the Debtor, there was no longer a security interest of American, the same having been released; (2) Horizon knew or should have known of the existence of Picker's outstanding security interest encumbering the assets of the Debtor, or certainly had constructive notice of same; and lastly (3), Horizon cannot rely on the doctrine of equitable subordination because it was a volunteer since it had no obligation and legal requirement to pay off the American loan on behalf of the Debtor.

This Court is satisfied that the facts described above are indeed without dispute and that this Adversary Proceeding can be decided by summary judgment. This Court is equally satisfied that the facts, together with the governing law, support Horizon's position that it is entitled to utilize the doctrine of equitable subrogation for the following reasons.

The doctrine of equitable subrogation has long been recognized by Florida courts. In order to invoke the doctrine, the party must establish the following: (1) that the party paid the debt; (ii) that the party had a liability, right or fiduciary relationship which equated a direct interest in discharging the debt or lien; and (iii) that no injustice is visited on the other party by applying equitable subrogation. *In re Munzenrieder Corp.*, 58 B.R. 228 (Bankr.M.D.Fla.1986). The effect of subrogation is that the party who discharges the debt stands in the shoes of the person whose claims have been discharged and

therefore, succeeds to all rights and priorities of the original creditor. *In re Eastern Marine, Inc.*, 104 B.R. 421 (Bankr. N.D.Fla.1989). Notwithstanding the invoking party's failure to discover a prior recorded lien, the court may order subrogation against intervening interests where the negligence has not caused harm to anyone. *Eastern National Bank v. Glendale Federal Savings and Loan Association*, 508 So.2d 1323, 1324 (Fla. 3rd DCA 1987).

■ Moreover, when a subsequent lender satisfies a prior mortgage with the proceeds of its loan to a borrower, the lender can utilize the doctrine of equitable subrogation to be subrogated to the priority of the original first mortgage because the funds derived from the mortgage were used to satisfy the original first mortgage. *Suntrust Bank v. Riverside National Bank of Florida*, 792 So.2d 1222 (Fla. DCA 4th 2001), *citing Federal Land Bank of Columbia v. Godwin*, 107 Fla. 537, 145 So. 883 (1933). In *Godwin*, the Supreme Court of Florida held that since Godwin represented to the bank that there were no other encumbrances on the land, it would be "grossly inequitable" to hold that the bank was not entitled to be treated as the first mortgage since the bank had advanced monies to retire Godwin's first mortgage with the express agreement that the bank would have a first lien on the land. *Godwin*, 145 So. at 885–86.

■ Based upon the foregoing principles, this Court is satisfied that the points raised by Picker regarding the use of the doctrine of equitable subrogation fail for the following reasons. First, concerning Picker's proposition that there is no lien for Horizon to "step into," this is not supported by the undisputed facts in this case. Horizon's security interest was properly recorded by filing its UCC–1 form prior to the release by American of its lien (March 1, 2000, Horizon's UCC–1 filed and March 16, 2000, American's UCC–3 filed). Thus, there was an existing first security position of American when Horizon filed its security interest on record.

Concerning Picker's second proposition, that is, the knowledge of Horizon of the outstanding interest of Picker, the case law is clear that negligence of the invoking party will not defeat a claim for equitable subrogation where the relief caused no harm to the other party (Picker). In this case, the record is clear that Horizon's attorney conducted a UCC records search but that Conoley ignored the UCC records search prepared by Horizon's attorney. However, it is unclear whether or not the attorney himself reviewed the search or merely provided it to Conoley. Nevertheless, the attorney did conduct a UCC records search and furnished the results to Conoley on the date of the closing, but Conoley did not review the search and proceeded to the closing to complete the transaction. Horizon was ignorant of Picker's lien position. The Debtor's representative expressly covenanted that there were no encumbrances upon the property but for American's UCC–1. Under *Godwin*, the doctrine of equitable subrogation will be applied to relieve negligence, where the position of the junior lienor will be in no worse of a position than before the first mortgage was satisfied. *Riverside National*, 792 So.2d at 1224–1225.

Finally, Picker contends that Horizon was a volunteer and under the well established principles of equitable subordination, one who voluntarily makes a payment on behalf of another who had no legal obligation to do so cannot invoke the doctrine. This is without merit, as Florida courts have long recognized that a lender who expressly satisfies a prior mortgage has the ability to utilize the doctrine of equitable subrogation. *See supra*. *See*

*also Palm Beach Savings & Loan Ass'n, F.S.A. v. Fishbein,* 619 So.2d 267 (Fla. 1993). In *Fishbein,* a husband forged his wife's signature in order to consolidate debt and paid off three mortgages on their homestead. Subsequently, the husband and wife were in dissolution proceedings. The homestead went into foreclosure and the wife contested the foreclosure stating that she had not consented to the mortgage. The trial court ruled that the mortgage could not be foreclosed but granted the bank an equitable lien. The district court reversed stating that the bank was negligent in not requiring the wife to sign the mortgage in person and therefore, it did not impose an equitable lien against the homestead. The Florida Supreme Court reversed the district court and held that the bank was entitled to equitable subrogation, emphasizing that if the bank had not lent the money which was used to pay off the three prior mortgages, the wife's interest in the home would have been subject to those mortgages, and she was "not entitled to a $930,000 windfall." *Fishbein,* 619 So.2d at 271.

In sum, it is clear from this record that both Horizon and Picker were less than diligent or careful in protecting their rights. Horizon was negligent by not paying attention to the results of the UCC due diligence search. Picker was negligent because it was notified of Horizon's first position on the assets of the Debtor and failed to raise any objections to this Court's initial Order authorizing the use of the cash collateral and affirming Horizon's first lien position on the assets of the Debtor.

In light of the controlling principles, it is this Court's duty to achieve a fair and equitable result. In these regards, the law is clear that since Picker has always been in a junior lien position to the lien of American, which secured an indebtedness of over $1 million. There is no injustice if Horizon is subrogated to American's prior first lien position to the sum of $259,118.57.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that the Plaintiff's Motion for Summary Judgment (Doc. No. 26) be, and the same is hereby, denied. It is further

ORDERED, ADJUDGED AND DE-CREED that the Defendant, Horizon Bank's Motion for Summary Judgment (Doc. No. 21) be, and the same is hereby, granted. It is further

ORDERED, ADJUDGED AND DE-CREED that Horizon is entitled to be subrogated to the priority of the first mortgage in the amount of $259,118.57. A separate Final Judgment will be entered in accordance to this Order.